James P. Connor
Andrew R. McFall
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
202-551-8394 (Connor)
connorja@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **21-cv-17578** |
| **v.** | |
| **SUYUN GU and YONG LEE,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**COMPLAINT**

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission"), 100 F Street, N.E., Washington, DC 20549, for its Complaint against Defendants Suyun Gu ("Gu"), whose last known address is 220 21st Street, Miami Beach, Florida 33139, and Yong Lee ("Lee"), whose last known address is 5409 Calle Mayor, Torrance, California 90505 (collectively "Defendants"), alleges as follows:

**SUMMARY**

1.      From February to April 2021, Gu and Lee perpetrated a fraudulent options-trading scheme to collectively obtain over $1 million in rebates from U.S. national security exchanges through thousands of "wash trades" – simultaneous or near-simultaneous purchases and sales of securities without an actual change in beneficial ownership.

2.      Gu's and Lee's scheme involved trading options – contracts that give the holder the right, but not the obligation to buy or sell shares of an underlying security at a specified price on or before a given date – to take advantage of the "maker-taker" fee model that options exchanges use to attract order flow and increase liquidity.  Under the model, non-marketable orders are eligible for a rebate paid by the options exchange ("make rebate").  Marketable orders that execute against those pre-existing orders then pay a fee when they are executed (a "take fee").  The rebates are based on the number of option contracts traded by the order.  Under most maker-taker fee models, the take fee is slightly larger than the make rebate, with the options exchange keeping the difference between the two amounts.

3.      Broker-dealers that direct orders to exchanges pay the take fees and collect the make rebates.  Some retail broker-dealers connect directly or indirectly to exchanges and pass take fees and make rebates back to their underlying customer accounts.  Other broker-dealers have order flow arrangements whereby they send their order flow to wholesale market makers rather than routing orders directly to exchanges.  If the wholesale market makers route the underlying orders to exchanges, they will pay take fees or collects make rebates for the underlying orders.  The wholesale market makers usually do not pass the take fees or make rebates back to the retail broker-dealers, which in turn do not pass anything back to their underlying customers.  In other words, retail customers using some brokerage accounts collect make rebates and pay take fees, while retail customers using other broker-dealers do not.

4.      To effectuate their scheme, Gu and Lee used accounts at a broker-dealer that passes back to clients make rebates collected for providing liquidity by placing non-marketable limit orders for out-of-the-money options – options that would be unprofitable to exercise at the time of the trading.  Gu and Lee then used accounts at a different brokerage firm that does not pass along take fees to place orders on the opposite side of the market for the same put options,

completing the wash trade.  For example, if they used one account that passes back make rebates to place a sell order, they would use a second account that does not pass back take fees to place a buy order for the same put options.  These two orders would be routed to the same exchange and execute against each other.  Gu and Lee would then collect the make rebate for that trade in the first account and avoid paying the take fee in the second account.

5.      Gu and Lee would then often reverse the trade using the same placement strategy to collect additional rebates.  For example, if they first sold the options from the account that passed back make rebates to the account that does not charge take fees, they would then buy back the same options by first placing an order in the account that passes back rebates, completing another wash trade.  Placing the trades in that order ensured Gu and Lee would receive rebates in one account and avoid fees in the other.

6.      Defendants first focused their wash-trading scheme on trading out-of-the-money put options in so-called "meme stocks" – a group of stocks that were actively promoted on internet-based social media platforms and message boards and experienced significant increases in trading volume and price in early 2021.  Gu and Lee believed that other market participants' interest in buying "meme stocks" and related price increases would make put options on those stocks less attractive, making it easier for Gu and Lee to trade with themselves.

7.      To conceal the scheme, Gu – the mastermind of the scheme who executed the vast majority of the wash trades and collected the bulk of the rebates – traded in the brokerage accounts of friends and family, used virtual private servers to mask his identity, and misrepresented his trading strategy to the broker-dealers through which he executed the wash trades.

8.      Gu and Lee effectuated this scheme during two time periods.  The first round of trading occurred between February 19, 2021 and March 4, 2021, when the broker-dealers they

used for this trading detected the conduct and froze their accounts.  Lee stopped trading at this point.  Gu, however, shifted his activity to different accounts and did a second round of trading from March 25, 2021 through April 15, 2021.

9.      Over the course of the scheme, Gu executed approximately 11,430 wash trades, which represented approximately 2.9 million option contracts traded in numerous underlying securities.  Gu received at least $1,370,000 in rebates as a result of the scheme, resulting in a net gain of at least $668,671 after commissions and fees.

10.     Lee executed approximately 2,360 wash trades, which represented approximately 405,000 options contracts traded in numerous underlying securities.  Lee received at least $174,000 in rebates as a result of the scheme, resulting in a net gain of at least $51,334 after commissions and fees.

11.     As a result of the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Indeed, Gu has informed the SEC staff that he may continue his wash trading scheme in the future.

12.     The Commission seeks a permanent injunction against Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

15.     In connection with the conduct described in this Complaint, Gu and Lee, directly or indirectly, made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange, in interstate commerce.

16.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Gu and Lee transacted business in this District, and certain of the acts, practices, transactions, and courses of business constituting violations of the securities laws alleged in this Complaint occurred within this District.  For example, most of the wash trades occurred on Exchange A, which is owned by a company located in New Jersey and which has its production servers located in New Jersey.  In addition, Gu used an account at Broker-dealer C, which is located in New Jersey.

## RELEVANT SECURITIES TRADING TERMS AND CONCEPTS

17.     A "put option" is a type of contract that gives the owner the right, but not the obligation, to sell 100 shares of an underlying security at a specified price within a specified time.  The "strike price" is the price per share at which the option owner can sell the underlying securities if he chooses to exercise the option.  The "expiration date" is the last day that an option contract is valid.  If the option owner chooses not to exercise the option (in other words, to not sell 100 shares of the underlying stock), the option expires and becomes worthless, and the

owner loses the money he paid to buy the option.  A put option becomes more valuable as the price of the underlying security decreases relative to the strike price.  Therefore, a buyer of a put option is betting that the price of the underlying security will decline.

18.    If, at the time of purchase, the strike price of a put option is below the price at which the underlying stock is then trading, the put option is "out-of-the-money" because it would be unprofitable to exercise the put option and sell the underlying stock at the strike price rather than to sell the stock directly at the prevailing market price.  Conversely, if at the time of purchase, the strike price is above the then-current trading price, the put option is considered "in-the-money."

20.    A wholesale market maker is a registered broker-dealer that, among other things, receives order flow from retail broker-dealers.  Wholesale markets makers sometimes trade against retail orders in a principal capacity and other times route the retail orders to other trading venues or exchanges.  For the put options traded by Gu and Lee, the wholesale market makers generally were not interested in trading against those orders on a principal basis given that the contracts were illiquid and far out-of-the-money.  They instead routed Defendants' orders to an exchange.

21.    The "National Best Bid" ("NBB") is the best available price at which there is a displayed order to buy an options contract.  The "National Best Offer" ("NBO") is the best available price at which there is a displayed order to sell a contract.

22.    A "non-marketable limit order" is an order that does not execute immediately because the limit price is above the NBB if a sell order or below the NBO if a buy order.  Because a non-marketable limit order does not execute immediately, it instead is added to or "rests on" the order book of the exchange to which it was routed.  Under maker-taker fee models,

non-marketable limit orders typically receive a make rebate when they are executed because they add liquidity to the exchange.

23.    A "marketable order" is an order that executes immediately when routed to an exchange.  It does this either because it is a market order or a limit order with a limit price that is at or below the NBB if a sell order or at or above the NBO if a buy order.  Marketable orders execute against the orders that rest on an exchange's order book and thus take liquidity off the exchange.  Marketable orders typically pay a take fee when they are executed.

## **DEFENDANTS**

24.    **Suyun Gu**, age 35, is a resident of Miami, Florida.  Gu previously resided in New York, New York.  Gu is self-employed and operates a nutritional supplement business that primary resells products through online marketplaces.

25.    **Yong Lee**, age 37, is a resident of Torrance, California.  Lee has been a personal friend of Gu for approximately 10 years.  Lee is an independent contractor working for Gu's nutritional supplement business.

## **RELATED PARTIES AND ENTITIES**

26.    Broker-dealer A is a retail broker-dealer headquartered in Greenwich, Connecticut.  Broker-dealer A passes make rebates and take fees back to its customers.

27.    Broker-dealer B is a retail broker-dealer headquartered in Menlo Park, California. Broker-dealer B sends its orders to wholesale market makers and does not pass make rebates or take fees back to its customers.

28.    Broker-dealer C is a retail broker-dealer headquartered in Morristown, New Jersey.  Broker-dealer C passes make rebates and take fees back to its customers.

29.    Broker-dealer D is a retail broker-dealer headquartered in Flushing, New York. Broker-dealer D sends its orders to wholesale market makers and does not pass make rebates or take fees back to its customers.

30.    Broker-dealer E is a retail broker-dealer headquartered in New York, New York. Broker-dealer E sends its orders to wholesale market makers and does not pass make rebates or take fees back to its customers.

31.    Exchange A is an options exchange operated by a company based in Princeton, New Jersey. Exchange A's production servers are located in New Jersey.

32.    Individual A resides in Totowa, New Jersey and has a familial relationship with Gu. Individual A opened an account at Broker-dealer B in his name and let Gu use that account to trade.

33.    Individual B resides in Brooklyn, New York. Individual B has a personal friendship with Gu and works for Gu's business. Individual B had an account at Broker-dealer B in his name and let Gu use that account to trade.

34.    Individual C resides in Snohomish, Washington. Individual C is personally acquainted with Gu. Individual C had an account at broker-dealer B in his name and let Gu use that account to trade.

## FACTS

### A.    Gu's Creation of the Scheme

35.    After graduating college, Gu worked briefly at several financial institutions as a trade system developer. In those roles and through his personal trading, Gu developed knowledge of the U.S. options market structure.

36.    Gu traded infrequently from 2010 through early 2021. Upon information and belief, Gu only executed one options trade during this time period, in January 2010.

37.     Gu became interested in options trading in early 2021, when there was increased market interest in certain securities, such as GameStop, Inc. (ticker: GME), AMC Entertainment Holdings, Inc. (ticker: AMC), BlackBerry Ltd. (ticker: BB), Nokia Corporation (ticker: NOK), and Rocket Companies, Inc. (ticker: RKT), colloquially known as "meme stocks."  Gu opened an account with Broker-dealer A on February 1, 2021 and started doing small trades in option contracts on various stocks.

38.     On February 18, 2021, the U.S. House of Representatives Financial Services Committee held a hearing related to the market volatility events in January 2021 primarily related to certain meme stocks.  At that hearing, the CEO of Broker-dealer B testified and noted that Broker-dealer B "pioneered commission free and zero contract fee options trading."  Gu watched all or part that hearing.  Consequently, Gu understood that Broker-dealer B did not pass along to its customers the take fees charged by exchanges.

39.     On February 19, 2021, Gu opened accounts at Broker-dealer B and Broker-dealer E.  He also opened an account at Broker-dealer D on February 21, 2021.  Gu understood that all three of these broker-dealers do not pass take fees back to their customers.  Gu also understood that Broker-dealer A and Broker-dealer C passed make rebates back to their customers.  Gu thus understood that the wash trading scheme would result in his receipt of make rebates, without paying take fees.

40.     Gu's scheme relied on identifying illiquid put options.  Gu was aware of the increased market interest in GME and other meme stocks.  He decided to trade out-of-the-money put option contracts on those stocks because he thought other market participants would not trade those contract because of the retail buying interest and related price increases.  Gu also tried to select put options that wholesale market makers would not want to trade against.  He instead hoped that the wholesale market makers would route his orders from Broker-dealers B, D, and E

to exchanges.  Gu thought the lack of interest in these contracts would make it easier for him to ensure that he traded with himself.

41.    In deciding to implement the scheme, Gu understood how maker-taker fee models work and testified that they exist "to promote liquidity on that particular exchange."  He also admitted that he was not trying to provide liquidity to the market; instead, his "intent was to trade against [him]self."

42.    Gu and Lee either knew or were reckless in not knowing that their wash trading scheme was illegal.  For example, during a sworn interview with the SEC staff, Gu stated that "wash trading in the sense of trading with no beneficial change of ownership is only illegal if it was done with the intent of market manipulation or creating a false market where there isn't one."  Yet Gu and Lee proceeded with their wash trading scheme that created the false impression of legitimate market activity when none existed, all to recover hundreds of thousands of dollars in ill-gotten rebates.

**B.    The First Round of the Wash Trading Scheme**

43.    Gu first implemented the wash trading scheme using an account at Broker-dealer A, which passes back make rebates, and an account at Broker-dealer B, which does not pass back take fees.  Gu opened his account at Brokerage Firm B on February 19, 2021 and immediately began placing small trades to test his strategy.

44.    Gu called Lee on February 19, 2021 and shared this strategy with him.  Lee opened an account at Broker-dealer B that same day and opened an account at Broker-dealer A a few days later.  Lee started using the wash trading strategy on February 26, 2021, once funds cleared into his account.

45.    To trade options in their accounts, Lee and Gu had to submit options approval forms.  Both Defendants misrepresented their options trading experience and average number of

option contracts traded per year on the options approval forms submitted to Broker-dealer A. For example, Gu indicated that he had more than 10 years of options trading experience and did 100+ options trades per year when he, in fact, had done one options trade in the past 11 years.

46.     Gu and Lee enabled a configuration feature on their accounts at Broker-dealer A that caused their orders to be routed to the exchange that offered the highest make rebate.  For almost all of their wash trading done through the accounts at Broker-dealer A, the routing feature caused the orders to be routed to Exchange A.

47.     At all times relevant to this Complaint, Exchange A charged a take fee of 50 cents per contract and, at the highest volume tier, paid a make rebate of 53 cents per contract. Exchange A paid the 3 cents difference itself to incentivize liquidity on the exchange.  When a trade from Broker-dealer A was executed on Exchange A and earned a rebate, Broker-dealer A passed 43 cents per contract back to Gu or Lee and kept 10 cents for itself.

48.     The following are two examples of how Gu and Lee executed the wash trading scheme to obtain rebates:

Example 1:  On March 4, 2021, Gu wash traded put options on Rocket Companies, Inc. (Ticker: RKT) with a $5 strike price and an expiration of June 18, 2021 to obtain rebates.  On March 4, 2021, RKT closed the trading day at $26.86 per share.

| Gu's March 4, 2021 Wash Trades in Options of Rocket Companies, Inc. (ticker: RKT) | | |
|---|---|---|
| Time | Event | Account |
| 13:07:54 | Gu places non-marketable limit order to sell 500 put option contracts | Broker-dealer A |
| 13:08:02 | Gu places marketable order to buy 500 put option contracts | Broker-dealer B |
| 13:08:03 | Gu's order to buy 500 contracts executes on Exchange A – Gu pays no take fee for this side of the trade | Broker-dealer B |
| 13:08:03 | Gu's order to sell 500 contracts executes on Exchange A – Gu receives $215 in make rebates for this side of the trade | Broker-dealer A |

| | | |
|---|---|---|
| 13:08:11 | Gu places non-marketable order to buy 500 put option contracts | Broker-dealer A |
| 13:08:22 | Gu places marketable order to sell 100 put option contracts | Broker-dealer B |

| 13:08:22 | Gu's order to sell 100 contracts executes on Exchange A – Gu pays no take fee for this side of the trade | Broker-dealer B |
| 13:08:22 | Gu's order to buy 100 put options contracts executes on Exchange A – Gu receives $43 in make rebates for this side of the trade | Broker-dealer A |
| 13:08:28 | Gu's places marketable order to sell 400 put option contracts | Broker-dealer B |
| 13:08:29 | Gu's order to sell 400 contracts executes on Exchange A – Gu pays no take fee for this side of the trade | Broker-dealer B |
| 13:08:29 | Gu's order to buy 400 put option contracts executes – Gu receives $172 in make rebates for this side of the trade | Broker-dealer A |

Example 2:  On March 1, 2021, Lee wash traded put options on Vale S.A. (Ticker: VALE) with a $14.50 strike price and an expiration of March 5, 2021 to obtain rebates.  On March 1, 2021, VALE closed the trading day at $17.53 per share.

| Lee's March 1, 2021 Wash Trades in Options of Vale S.A. (Ticker: VALE) | | |
|---|---|---|
| **Time** | **Event** | **Account** |
| 15:41:31 | Lee places non-marketable limit order to sell 90 put option contracts | Broker-dealer A |
| 15:41:43 | Lee places marketable order to buy 90 put option contracts | Broker-dealer B |
| 15:41:43 | Lee's order to buy 90 put option contracts executes on Exchange A – Lee pays no take fee for this side of the trade | Broker-dealer B |
| 15:41:43 | Lee's order to sell 90 put option contracts executes on Exchange A – Lee receives $38.70 in make rebates for this side of the trade | Broker-dealer A |

| 15:41:59 | Lee places non-marketable order to buy 90 put option contracts | Broker-dealer A |
| 15:42:11 | Lee places marketable order to sell 90 put option contracts | Broker-dealer B |
| 15:42:11 | Lee's order to sell 90 put option contracts executes on Exchange A – Lee pays no take fee for this side of the trade | Broker-dealer B |
| 15:42:11 | Lee's order to buy 90 put option contracts executes on Exchange A – Lee receives $38.70 in make rebates for this side of the trade | Broker-dealer A |

49.    On March 4, 2021, Broker-dealers A and B froze Defendants' accounts because of concerns about market manipulation and wash trading.  A representative from Broker-dealer A spoke with Gu and Lee on or about March 12, 2021 and asked whether they knew who was on the other side of their trades.  Lee asked if he had to answer the question, was told he did not have to, and then declined to answer it.  Similarly, Gu told Broker-dealer A that he "didn't want to confirm or deny anything."

50.     The following chart summarizes Gu and Lee's wash trading during the first round:

|  | Gu | Lee |
| --- | --- | --- |
| Dates of trading | 2/19/2021 – 3/4/2021 | 2/26/2021 – 3/4/2021 |
| Approx. wash trades | 8,300 | 2,360 |
| Approx. contracts traded | 2.6 million | 405,000 |
| No. of underlying securities | 15 (including GME, AMC, BB & NOK) | 14 (including GME, AMC, BB & NOK) |

51.     Gu's first round of wash trading resulted in his accounts receiving rebates of more than $1,121,000 and net gains of at least $490,346 after paying commissions and certain fees. Lee's trading resulted in rebates of at least $174,000 and net gains of at least $51,334 after commissions and fees.

## C.     The Second Round of the Wash Trading Scheme

52.     After Broker-dealer A froze his account, Gu opened an account at Broker-dealer C on March 9, 2021.  Like Broker-dealer A, Broker-dealer C passed make rebates back to its customers.

53.     During the process of opening that account, a representative from Broker-dealer C asked Gu why he was changing broker-dealers.  Gu falsely answered that the "biggest thing is I wanted to do direct routing."  As Gu has admitted to the SEC staff, he changed accounts because Broker-dealer A froze his account due to concerns about wash trading, not because he "wanted to do direct routing."  Gu further testified during the SEC's investigation that he did not tell Broker-dealer C the truth because he was afraid that it "might reflect negatively" and prevent him from opening an account at Broker-dealer C.

54.     Gu used several brokerage accounts to trade with his account at Broker-dealer C. He first wash traded in an account in his name at Broker-dealer D, which does not pass take fees

back to its customers.  Gu opened that account on February 21, 2021 but did not use it until he

started the second round of trading on March 25, 2021.

55.    Broker-dealer D froze Gu's account on March 31, 2021 and asked questions about

Gu's trading strategy.  In response to those questions, Gu failed to disclose his true wash trading

strategy.  During the SEC's investigation, Gu admitted that he did not provide a complete

explanation of his wash trading strategy to Broker-dealer D because he was hoping he could get

Broker-dealer D to lift the account freeze.

56.    The following month, in April 2021, Gu started wash trading to obtain make

rebates in another account in his name at Broker-dealer E, which he had opened in February

2021.  Broker-dealer E does not pass take fees back to its customers.

57.    Gu also used the brokerage accounts of others to perpetrade his wash trading

scheme.  For example, on March 1, 2021, Gu asked a family member (Individual A) to open an

account at Broker-dealer B, fund the account, and let Gu use it to trade.  Gu used a virtual private

server to make it appear to Broker-dealer B that the trading in Individual A's account came from

a different computer and different internet protocol address than Gu had used for his own

account at Broker-dealer B.

58.    Gu then perpetraded the same wash trading scheme described above, this time

through his account at Broker-dealer C and Individual A's account at Broker-dealer B.  For

example, on March 26, 2021, using Individual A's account, Gu wash traded put options on AMC

Holdings, Inc. (Ticker: AMC) with a $0.50 strike price and an expiration of September 17, 2021

to obtain make rebates.  On March 26, 2021, AMC closed the trading day at $10.24 per share.

| Gu's March 26, 2021 Wash Trades in Options of AMC Entertainment Holdings, Inc. (ticker: AMC) | | |
|---|---|---|
| Time | Event | Account |
| 11:39:46 | Gu places non-marketable limit order to sell 195 put option contracts | Broker-dealer C |
| 11:39:57 | Gu places marketable order to buy 195 put option contracts | Broker-dealer B (Individual A) |

| | | |
|---|---|---|
| 11:39:58 | Gu's order to buy 195 contracts executes on Exchange A – Gu pays no take fee for this side of the trade | Broker-dealer B  (Individual A) |
| 11:39:58 | Gu's order to sell 195 contracts executes on Exchange A – Gu receives $83.85 in make rebates for this side of the trade | Broker-dealer C |

| | | |
|---|---|---|
| 11:40:42 | Gu places non-marketable order to buy 195 put option contracts | Broker-dealer C |
| 15:40:48 | Gu places marketable order to sell 195 put option contracts | Broker-dealer B (Individual A) |
| 11:40:49 | Gu's order to sell 195 contracts executes on Exchange A – Gu pays no take fee for this side of the trade | Broker-dealer B (Individual A) |
| 11:40:49 | Gu's order to buy 195 put options contracts executes on Exchange A – Gu receives $83.85 in make rebates for this side of the trade | Broker-dealer C |

59.     On April 5, 2021, Gu contacted a friend (Individual B) and asked if he could use Individual B's account at Broker-dealer B.  Individual B had opened the account in January 2021 but did not use it to trade.  Individual B agreed.  Gu then wired $25,000 to Individual B's bank account, which was then wired by Gu – using Individual B's login credentials – to Broker-dealer B to fund the account.  Gu used a second virtual private server to make it appear to Broker-dealer B that the trading in Individual B's account came from a different computer and different internet protocol address than Gu had used for: (a) his own account at Broker-dealer B; and (b) Individuals A's account at Broker-dealer B.

60.     Gu again perpetraded the wash trading scheme described above, this time through his account at Broker-dealer C and Individual B's account at Broker-dealer B.  For example, on April 12, 2021, Gu wash traded put options on United Fire Group, Inc. (Ticker: UFCS) with a $20 strike price and an expiration of May 21, 2021 to obtain rebates.  On April 12, 2021, UFCS closed the trading day at $33.73 per share.

| Gu's April 12, 2021 Wash Trades in Options of United Fire Group, Inc.  (ticker: UFCS) | | |
|---|---|---|
| **Time** | **Event** | **Account** |
| 9:38:10 | Gu places non-marketable limit order to sell 96 put option contracts | Broker-dealer C |
| 9:38:36 | Gu places marketable order to buy 96 put option contracts | Broker-dealer B (Individual B) |
| 9:38:36 | Gu's order to buy 96 contracts executes – Gu pays no take fee for this side of the trade | Broker-dealer B  (Individual B) |
| 9:38:36 | Gu's order to sell 96 contracts executes – Gu receives $76.80 in make rebates for this side of the trade | Broker-dealer C |

| | | |
|---|---|---|
| 9:38:59 | Gu places non-marketable order to buy 96 put option contracts | Broker-dealer C |
| 9:39:00 | Gu places marketable order to sell 96 put option contracts | Broker-dealer B (Individual B) |
| 9:39:00 | Gu's order to sell 96 contracts executes – Gu pays no take fee for this side of the trade | Broker-dealer B (Individual B) |
| 9:39:00 | Gu's order to buy 96 put options contracts executes – Gu receives $81.60 in make rebates for this side of the trade | Broker-dealer C |

59. On April 15, 2021, Gu started using an the account of his acquaintance (Individual C) at Broker-dealer B to continue his wash trading scheme and obtain make rebates. Gu used a third virtual private server for the trading in this account.

60. Shortly after Gu started trading in this account on March 5, 2015, Broker-dealer C sent an email asking Gu about some of the trades in his account and inquiring about his strategy. Gu answered that his "goal is to open and close trades at the same price (or if need be at a slightly higher price to close out the position if I'm unable to get a fill at the same) and profit from the rebates."  In response to Broker-dealer C's inquiries, Gu failed to inform Broker-dealer C that he was doing wash trades and on both sides of the trades in question.  Gu testified to the SEC that he did not think that information was "relevant" to Broker-dealer C.  Upon information and belief, Broker-dealer C would have not allowed Gu to trade if they knew he was wash trading with the account.

61.     Broker-dealer C froze Gu's account on or about April 15, 2021.

62.     During investigative testimony, Gu said that, although he is not currently using his trading strategy, he may do so in the future.  Gu also admitted that he continued to engage in wash trading after receiving the SEC's investigative subpoena seeking sworn testimony and documents.

63.     In total, Gu's account at Broker-dealer C executed approximately 3,130 wash trades with the Gu's accounts at Broker-dealer D and E and the three accounts in names of Individuals A, B and C at Broker-dealer B.  Unlike the first round of trading, these trades occurred on several different options exchanges.  Gu's second round of wash trading resulted in his account receiving rebates of more than $249,000 and net gains of more than $178,000 after paying commissions and certain fees.

64.     The following chart summarizes Gu's second-round wash trading:

| Round Two -- Gu | |
|---|---|
| Dates Used | Rebate receiving account | Take fee avoiding account |
| 3/25 – 4/15 | Broker-dealer C (Gu) | Broker-dealer D (Gu) |
| | | Broker-dealer E (Gu) |
| | | Broker-dealer B (Individual A, used by Gu) |
| | | Broker-dealer B (Individual B, used by Gu) |
| | | Broker-dealer B (Individual C, used by Gu) |
| Approx. wash trades | | 3,130 |
| Approx. contracts traded | | 315,000 |
| No. of underlying securities | | 71 (including GME, AMC, BB & NOK) |

**D.     The Defendant's Trading Affected the Markets**

65.     In addition to being an inherently deceptive, fraudulent device, Gu and Lee's wash trades materially affected the overall trading volume in the put options of multiple different securities.  For example, the following chart shows Gu and Lee's approximate volume of trading

in put contracts on certain underlying securities compared to the overall market volume on March 4, 2021.

| Underlying security | Gu/Lee puts in underlying securities | Total puts in underlying securities | Gu/Lee % of total |
|---|---|---|---|
| AMC | 229,128 | 362,946 | 63% |
| BB | 155,991 | 174,794 | 89% |
| GME | 544,903 | 677,023 | 80% |
| NOK | 58,608 | 98,390 | 60% |

66.     In addition to substantially contributing to the volume of trading, Gu and Lee's trading prompted other traders to trade the options that they targeted.  As an example of this market impact, on April 1, 2021, Gu wash traded 889 put options on the underlying security UMH Properties, Inc. (ticker: UMH) with a $15 strike price and an expiration of June 18, 2021. On that same day, other traders executed approximately 790 trades in this options contract (the vast majority with Gu on the other side of their trade).  During the preceding 18 trading days, from March 8, 2021 through March 31, 2021, however, this contract only traded on two days and only for a total of six contracts traded.  In other words, and upon information and belief, Gu's wash trading in this contract induced other traders to place trades in an otherwise illiquid option contract.

67.     As another example of this impact, on March 3, 2021, Gu and Lee wash traded approximately 70,000 contracts on the underlying security AMC with a 50 cents strike price and an expiration of April 1, 2021.  Although this contract had no volume on March 2, 2021 (the day prior to Gu's and Lee's March 3, 2021 wash trading), traders executed approximately 4,800 trades in this contract on the day of Gu's and Lee's wash trades, approximately 1,000 of which involved Gu or Lee on the other side.  In other words, and upon information and belief, that Gu's

and Lee's wash trading in this contract induced other traders to place trades in an otherwise

illiquid option contract.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a)(1) and (2) of the Securities Act
### (Defendants Gu and Lee)

68.     The Commission realleges and incorporates by reference paragraphs 1 through

67, as though fully set forth herein.

69.     By reason of the conduct described above, Defendants in connection with the

offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or

of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i)

employed devices, schemes, or artifices to defraud; and (ii) obtained money or property by

means of any untrue statement of a material fact or any omission to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

70.     By reason of the conduct described above, Defendants, directly or indirectly,

violated Securities Act Sections 17(a)(1) and (2) [15 U.S.C. §77q(a)(1) and (2)] and will

continue to violate those sections unless enjoined.

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5 Thereunder
### (Defendants Gu and Lee)

71.     The Commission realleges and incorporates by reference paragraphs 1 through

70, as though fully set forth herein.

72.     By reason of the conduct described above, Defendants, in connection with the

purchase or sale of securities, with scienter, by the use of any means or instrumentality of

interstate commerce or of the mails, or of any facility of any national securities exchange,

directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

73.    By reason of the conduct described above, Defendants, directly or indirectly, violated and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

Enter a Final Judgment permanently restraining and enjoining Defendants and their agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Enter a Final Judgment directing Defendants to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

### III.

Enter a Final Judgment directing Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

### IV.

Grant such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated:  September 27, 2021     Respectfully submitted,

             s/ James P. Connor
             James P. Connor (D.C. Bar No. 981684)
             Andrew R. McFall (D.C. Bar No. 497878)
             UNITED STATES SECURITIES AND EXCHANGE
             COMMISSION
             100 F Street, NE
             Washington, DC 20549
             Phone: (202) 551-8394 (Connor)
             Email:  connorja@sec.gov (Connor)

## **LOCAL RULE 11.2 CERTIFICATION**

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

By:    s/ James P. Connor
James P. Connor (D.C. Bar No. 981684)
Andrew R. McFall (D.C. Bar No. 497878)
UNITED STATES SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549
Phone: (202) 551-8394 (Connor)
Email:  connorja@sec.gov (Connor)

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Rule 101.1(f), because Plaintiff Securities and Exchange Commission does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as an alternative to the Commission to receive service of all notices or papers in the captioned action.

Therefore, service upon the United States Attorney's Office or its authorized designee:

> David E. Dauenheimer
> Deputy Chief, Government Fraud Unit
> United States Attorney's Office District of New Jersey
> 970 Broad Street, Suite 700
> Newark, NJ 07102-2534

shall constitute service upon the Commission for purposes of this action.

Dated:  September 27, 2021

Respectfully submitted,

s/ James P. Connor
James P. Connor (D.C. Bar No. 981684)
Andrew R. McFall (D.C. Bar No. 497878)
UNITED STATES SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549
Phone: (202) 551-8394 (Connor)
Email:  connorja@sec.gov (Connor)