<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| United States Securities and Exchange Commission,<br><br>Plaintiff,<br><br>v.<br><br>Suyun Gu, et al.,<br><br>Defendants. | Civil Action No. 21-17578 (SDW) (AME)<br><br>**OPINION**<br><br>September 6, 2024 |

**WIGENTON**, District Judge.

Before this Court is Plaintiff United States Securities and Exchange Commission's ("SEC") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 ("Motion"). Jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1331, 1337, and 1391(b). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, the SEC's Motion is GRANTED.

## I.    <u>FACTUAL AND PROCEDURAL HISTORY</u>[1]

### A.  **The Maker-Taker Model**[2]

---

[1] Citations to "D.E." refer to the docket entries for the Amended Complaint and the parties' motion papers, including briefs, affidavits, declarations, and exhibits attached thereto. Facts cited in this opinion are drawn from the SEC's Reply Statement of Facts (D.E. 83-1), which includes facts cited in the SEC's Statement of Undisputed Material Facts and Defendant Suyun Gu's Response to the SEC's Rule 56.1 Statement Undisputed Material Facts (D.E. 69-2, 82-2), and the parties' briefings and exhibits for the present Motion. (D.E. 69–76, 82, 83.) The facts are undisputed unless noted otherwise.

[2] For an overview of the maker-taker model, see *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020) and Andrew Bloomenthal, *What Maker-Taker Fees Mean for You*, Investopedia, https://www.investopedia.com/articles/active-trading/042414/what-makertaker-fees-mean-you.asp (last visited August 31, 2024).

Before summarizing the factual and procedural background of this case, this Court will provide a brief overview of the "maker-taker" model. Under the maker-taker model, some stock exchanges pay a rebate to brokerage firms for posting an offer to buy or sell a security at a given price and quantity—also known as "making" a market or adding liquidity—on the exchange. The goal is to incentivize brokerage firms to send order flow to the exchanges to increase the liquidity of securities in the market. On the other hand, exchanges charge a "take" fee when someone accepts the order, thereby taking liquidity from the market. Some brokerage firms pass liquidity rebates to their customers, and some do not collect take fees. (*See* D.E. 69-1 at 13.)

### B. Factual Background

This lawsuit arises out of the SEC's allegations that Defendant Suyun Gu ("Defendant" or "Gu") engaged in thousands of "wash trades"[3]—sales of securities in which he was both the seller and buyer and there was no change in beneficial ownership—to fraudulently obtain over $1 million in liquidity rebates offered by stock exchanges for certain types of trades. (*See* D.E. 44. ¶¶ 1–12.)

> i.      *Gu's wash trading scheme*

In early February 2021, Gu became aware of the maker-taker model, and that some brokerage firms passed liquidity rebates to their customers, and some did not collect take fees. (D.E. 83-1. ¶¶ 47–51, 72–76.) Accordingly, Gu developed a trading strategy that involved trading certain securities at the same quantity and price between two accounts he controlled at different brokerage firms, where the first account passed liquidity rebates to him, and the second account did not charge him take fees. (*Id.* ¶¶ 47–51, 72–79.) When "matched" buy and sell orders[4] were

---

[3] "'Wash' sales are transactions involving no change in beneficial ownership." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205 n.25; *accord United States v. Georgiou*, 777 F.3d 125, 131 n.6 (3d Cir. 2015).

[4] "'Matched' orders are orders for the purchase [or] sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." *Hochfelder*, 425 U.S. at 205 n.25; *accord Georgiou*, 777 F.3d at 131 n.5.

routed to the same exchange and executed against each other, Gu collected liquidity rebates and avoided paying a take fee.  (*Id*. ¶¶ 23, 77–81.)

Gu admits that the purpose behind his trades was to profit from liquidity rebates, not to add liquidity to the market, (D.E. 70-3 Tr. 50:12–20, 124:21–25), and that other than the rebate, the trades themselves did not generate any profit.  (*Id*. at 37:8–11.)  To accomplish his goal, Gu understood that he needed to trade between two accounts he controlled because identical buy and sell orders placed in the same account would cancel each other out and not generate a rebate.  (D.E. 83-1 ¶ 80.)  Gu also knew how to cause his orders to be routed to an exchange that offered the highest liquidity rebates.  (*Id*. ¶ 115.)  In addition, Gu focused his trades on "thinly traded"[5] "out of the money" option contracts[6] that he thought were unattractive to other market participants to ensure that he only traded with himself.  (*Id*. ¶¶ 82, 84, 333.)

The wash trading occurred in two rounds from February 19 to April 15, 2021.  (*See generally*, D.E. 69-2 at 12.)  During this time frame, Gu executed more than 11,000 trades between accounts he controlled, representing approximately three million option contracts, and received approximately $1.4 million in liquidity rebates, resulting in $621,703 in net profit after subtracting commissions and fees.  (D.E. 83-1 ¶¶ 334, 336.)  Gu's wash trades often represented the vast majority of the total market volume in the securities he traded.  (*See id.* ¶¶ 328–31.)  Throughout the relevant time frame, Gu's orders and trades were visible to other market participants as a small percentage of his orders was inadvertently traded with other market participants.  (*Id*. ¶¶ 140, 274,

---

[5] "Thinly traded securities are those that cannot be easily sold or exchanged for cash without a significant change in price.  Thinly traded securities are exchanged in low volumes and often have limited numbers of interested buyers and sellers . . . ."    James Chen, *Thinly Traded: What It Means How It Works, Risks*, Investopedia, https://www.investopedia.com/terms/t/thinly-traded.asp (last visited August 31, 2024).

[6] "Option contracts" or "options" give the holder the right to buy or sell shares of an underlying security at a specified price on or before a given date.  (D.E. 69-1 at 9 n.3.)  "Out of the money" options are options that would be unprofitable to exercise at the time of the trading.  (*Id*. at 14.)

312, 335.)  Other market participants would have no way of knowing that Gu was trading with himself.  (*Id.* ¶ 337.)

    ii.  *Gu's first round of trading—from February 19 to March 4, 2021*

  In February 2021, Gu shared his trading strategy with his friend and employee Yong Lee ("Lee") and both opened accounts at Robinhood Financial LLC ("Robinhood") and Interactive Brokers LLC ("Interactive").[7]  (*Id.* ¶¶ 52, 56, 96–98.)  Interactive paid liquidity rebates to its customers and Robinhood did not charge its customers take fees.  (*Id.* ¶¶ 37, 73.)

  Gu falsely inflated his experience in options trading in his account applications, concealing the fact that he had made only one options trade between 2010 and 2021, and instructed Lee to do the same in his application.[8]  (*Id.* ¶¶ 101–11.)  Based on Gu's and Lee's misrepresentations, Robinhood and Interactive approved their applications and permitted them to trade options.  (*Id.* ¶¶ 113–14.)

  On February 19, 2021, he placed small "test trades" to verify that he would be the counterparty to his trades.  (*Id.* ¶ 132.)  Between February 19 and March 4, 2021, Gu traded options between his Interactive and Robinhood accounts.  (*Id.* ¶¶ 122–62.)  For example, on March 4, 2021, Gu placed an order to sell five hundred put option[9] contracts for a certain stock in Interactive, and seconds later, he placed an order to buy five hundred put option contracts for the same stock in Robinhood.  (*Id.* ¶¶ 142–43.)  Gu then placed an order in Interactive to buy options for the same stock—in the same quantity and price—from his Robinhood account, thereby completing his wash

---

[7] Robinhood and Interactive are retail broker-dealer companies that provide a platform for trading securities.

[8] In his Robinhood application, Gu certified that the information he furnished was completely true and accurate.  (*Id.* ¶¶ 101–02.)

[9] A "put option" is a type of contract that gives the owner the right, but not the obligation, to sell an underlying security at a specified price and quantity within a specified time.  (*See* D.E. at 7.)

trade.  (*Id*. ¶ 144.)  As a result, Gu received $430 in liquidity rebates from Interactive in less than a minute and paid no take fee.  (*Id.* ¶¶ 142–44.)  Gu admits that the purpose of placing trades between his Robinhood and Interactive accounts was to profit from liquidity rebates.  (*Id*. ¶ 124.)

On March 4, 2021, Robinhood and Interactive suspended Gu's and Lee's accounts, and Lee stopped trading.  (*Id*. ¶ 146.)  On the same day, Lee sent Gu a text message with a link to a definition of "wash trading" on Wikipedia, which stated:  "A wash trade is a form of market manipulation in which an investor simultaneously sells and buys the same financial instruments to create misleading, artificial activity in the marketplace."  (*Id*. ¶ 94.)  During the first round of trading, Gu's trades generated approximately $1,121,468 in liquidity rebates and approximately $410,657 in net profit after commissions and fees.  (*Id*. ¶ 160.)

On or about March 12, 2021, an Interactive representative spoke with Gu and asked whether Gu knew the counterparty to his trades.  (*Id.* ¶ 161.)  Gu declined to answer because he believed that if he admitted that he was the counterparty to his trades, Interactive would be less likely to reinstate his account and allow him to continue trading.  (*Id.* ¶¶ 161–62; D.E. 70-3 Tr. 84:18–22.)

### iii.    *Gu's second round of trading—from March 25 to April 15, 2021*

After Robinhood and Interactive suspended Gu's accounts, Gu continued to execute wash trades between his accounts at other brokerage firms.  During this time frame, Gu traded between his own accounts at Lightspeed Financial Services Group LLC ("Lightspeed"), Firstrade Securities, Inc. ("Firstrade"), and Webull Financial Services ("Webull"), and between his

Lightspeed account and Robinhood accounts nominally owned by three other individuals.[10]  (D.E. 83-1 ¶¶ 163–325.)

>    a.  Trading between Gu's accounts at Lightspeed, Firstrade, and Webull

Gu opened accounts with Firstrade and Webull in February 2021.  (*Id.* ¶¶ 61, 65.)  On March 10, 2021, Gu applied to open a trading account with Lightspeed and inaccurately stated in his application that he had five or more years of options trading experience.  (*Id.* ¶¶ 163, 171.) Based on the information provided by Gu, Lightspeed approved Gu's account application.  (*Id.* at ¶ 171.)  Gu admits that his goal in opening an account at Lightspeed was to profit from rebates by trading options.  (*Id.* at ¶ 171.)

On March 29, 2021, Lightspeed asked Gu about "the rationale or strategy behind" Gu's trades.  (*Id.* ¶ 210.)  In Gu's answer, he concealed from Lightspeed that, rather than having other market participants to "fill" his orders, his goal was to be the counterparty in his own trades and profit from the liquidity rebates.  (*Id.* ¶¶ 211–14.)  Gu admits that he did not tell Lightspeed that he was trading with himself because he did not want Lightspeed to close his account.  (*Id.* ¶ 210.)

Beginning on March 25, 2021, Gu executed wash trades between his accounts at Lightspeed and Firstrade.  (*Id.* ¶¶ 218–23.)  After Firstrade suspended Gu's account on March 30, 2021, it asked Gu about his trading strategy.  (*Id.* at ¶¶ 234–35.)  In his subsequent communications with Firstrade, Gu made false or misleading statements about his intent and strategy behind his trades and did not disclose that his strategy was designed to profit from liquidity rebates or the fact that he was executing wash trades with his Lightspeed account.  (*Id.* ¶¶ 236–39.)  Gu acknowledges

---

[10] Like Interactive and Robinhood, Lightspeed, Firstrade, and Webull are retail broker-dealer firms that provide a platform for trading securities.  Lightspeed paid liquidity rebates to customers and Firstrade and Webull did not charge take fees.  (*Id.* ¶¶ 72, 74, 163.)

that he made misrepresentations to Firstrade because he wanted his account to be restored so he could continue to carry out his trading strategy.  (*Id.* ¶¶ 240–41.)

In April 2021, Gu also executed wash trades between his Lightspeed and Webull accounts.  (*Id.* ¶¶ 282–88.)  On April 15, 2021, Lightspeed froze Gu's account.  (*Id.* ¶ 324.)

> ### b. Trading between Gu's account at Lightspeed and accounts nominally owned by others

On March 1, 2021, Gu asked his father, Yixian Gu, to open a Robinhood account.  (*Id.* at ¶ 188.)  Between March 26 and April 15, 2021, Gu placed matched orders and executed wash trades between his account at Lightspeed and Yixian Gu's Robinhood account to obtain liquidity rebates.  (*Id.* ¶¶ 188–202.)  Gu also used a virtual private server to make it appear that the trading in Yixian Gu's account came from a different IP address than Gu's account.  (*Id.* ¶ 192.)

In April 2021, Gu placed wash trade orders using his Lightspeed account and his employee's, Kemar Channer, Robinhood account.  (*Id.* ¶¶ 264–73.)  On April 6, 2021, Gu wired approximately $25,000 to Channer's bank account, which Gu then transferred to Channer's Robinhood account using Channer's login credentials.  (*Id.* ¶¶ 251–55.)  To further effectuate his wash trading scheme, Gu also changed Channer's investment profile in Robinhood to falsely represent that Channer's experience in options trading and income so that Robinhood would allow Channer's account to trade options.  (*Id.* ¶¶ 258–61.)

Gu admits that his intent was to use Channer's account to offset trades made from Gu's Lightspeed account.  (*Id.* ¶¶ 267–68.)  Gu used a second virtual private server to make it appear that his trades in Channer's account came from a different IP address than the other accounts Gu used.  (*Id.* ¶ 263.)

In April 2021, Gu's friend, Luke Wechselberger, provided Gu with the login credentials for his Robinhood account. (*Id.* ¶¶ 10, 298–300.) After altering Wechselberger's investment profile to falsely represent Wechselberger's options trading experience, Gu started using Wechselberger's Robinhood account to trade with his Lightspeed account. (*Id.* ¶¶ 301–10.)

Gu used a third virtual private server to make it appear that the trading in Wechselberger's account came from a different IP address. (*Id.* ¶ 307.) Gu admits that he used multiple virtual private servers so that he could have multiple accounts open at the same time to trade with himself. (*Id.* ¶¶ 308–09.)

### C.  Procedural History

On September 27, 2021, the SEC filed a Complaint in this Court against Gu and Lee, charging them with two counts:  violations of § 17(a)(1) and (2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(1) and (2); and violations of § 10(b) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), as well as Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. (D.E. 1 ¶¶ 68–73.)

Lee quickly consented to judgment against him, which this Court entered on September 29, 2021. (D.E. 5.) On July 13, 2022, this Court issued an opinion and order denying Gu's Motion to Dismiss. (D.E. 22, 23.) On December 20, 2022, the SEC filed an Amended Complaint, charging Gu with the same two offenses above and a third offense for violations of § 9(a)(1) of the Exchange Act, 15 U.S.C. § 78i(a)(1). (D.E. 44 ¶¶ 77–79.)

Following discovery, the SEC filed the instant Motion on February 19, 2024 pursuant to Rule 56, and the parties timely completed briefing. (*See* D.E. 69, 82, 83.)

## II.  **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must "set forth specific facts showing the existence of . . . an issue for trial."  *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (citing Fed. R. Civ. P. 56(e)).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."  *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325).  Further, the nonmoving party is required to "point to concrete evidence in the record [that] supports each essential element of its case."  *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004) (citing *Celotex Corp.*, 477 U.S. at 322–23).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322–23.

"[A] district court may not make credibility determinations or engage in any weighing of the evidence."  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Liberty*

*Lobby*, 477 U.S. at 255).  Instead, the district court "must view all of the facts in the light most favorable to the non-moving party," who is entitled to "every reasonable inference that can be drawn from the record," and if "there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Reedy v. Evanson*, 615 F.3d 197, 209 (3d Cir. 2010) (citations omitted).

## III.   <u>DISCUSSION</u>

### A.  Violations of § 9(a)(1) of the Exchange Act (Count III)

Section 9(a)(1) of the Exchange Act, 15 U.S.C. § 78i(a)(1), "proscribes wash sales and matched orders when effectuated '[f]or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or . . . with respect to the market for any such security.'" *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205, n.25 (1976) (alteration in original) (citations omitted) (noting that Congress identified wash trades and match orders as "specific practices that were considered so inimical to the public interest as to require express prohibition."); *In re RenovaCare, Inc. Sec. Litig.*, No. 21-13766, 2024 WL 2815034, at *16 (D.N.J. June 3, 2024) ("Section 9(a) proscribes specific behavior . . . that may constitute market manipulation . . . , 'such as wash sales[] [and] matched orders . . . .'" (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977))).

Although the Third Circuit has not definitively established the elements of a § 9(a)(1) violation, other courts have articulated the relevant legal standard.  To prove a violation of § 9(a)(1), the SEC must establish that (1) a defendant executed "a wash sale or matched orders in a security"; (2) "with scienter"; and (3) "for the purpose of creating a false or misleading appearance of active trading in that security."  *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (quoting *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1163 (5th Cir. 1982)).

The SEC argues that Gu violated § 9(a)(1) of the Exchange Act by entering thousands of matched orders and wash trades across multiple brokerage accounts owned or controlled by Gu. This Court finds that the SEC has sufficiently proven all three elements for a § 9(a)(1) claim. Each will be analyzed each in turn.

### i. Gu executed wash trades and matched orders

There are no genuine issues of material fact as to whether Gu executed wash trades and matched orders by being his own counterparty in his transactions.

Gu does not dispute that he entered thousands of matched orders[11] using his and other people's brokerage accounts, which resulted in no change in beneficial ownership of the traded securities.[12]  (See D.E. 83-1 ¶¶ 77–80, 152–56, 181–82.)  He admits that his trading strategy was to buy and sell certain securities at substantially the same price, quantity, and time.  (See id. ¶¶ 78–79; D.E. 72 Tr. 123: 9–11; D.E. 70-3 Tr. 37:24–38:9, 38:17–39:7, 96:8–98:9.)

Gu argues that the SEC cannot prove the first element because 1,095 of the 17,819 trades he executed during the relevant time frame resulted in change in beneficial ownership.  In the same breath, Gu admits that he was his own counterparty in 16,724 trades—about ninety four percent of his trades.  In essence, Gu argues that he could not have engaged in wash trading because he was not his counterparty in a small percentage of his trades.  This Court finds Gu's argument unpersuasive when considering the fact that he executed over ten thousand wash trades.  See SEC v. Competitive Techs., Inc., No. 04-1331, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005)

---

[11] A matched order "does not require that there be no effective change in beneficial ownership" and may occur "when a trader buys or sells with the knowledge that there is a matching order on the other side and does so for one of the two prohibited purposes listed at the beginning of § 9(a)(1)."  United States v. Chartier, No. 22-3125, 2024 WL 3617023, at *9 (2d Cir. Aug. 1, 2024).

[12] While Gu's wash trades in the Second Round involved brokerage accounts owned by others, these trades did not result in any real change of beneficial ownership as he had sufficient control over these accounts.  For example, Gu controlled and funded Channer's Robinhood account to execute wash trades with Gu's Lightspeed account.  (D.E. 83-1 ¶¶ 254–64.)

(finding that the SEC's allegations that defendants engaged in wash trades on five occasions was sufficient to make out a § 9(a) claim).

Based on the record evidence, no reasonable jury could find that Gu did not execute wash trades or matched orders.

> ii.    *Gu executed wash trades and matched orders with scienter and for the purpose of creating a false or misleading appearance of active trading*

The SEC has sufficiently proven that Gu acted with the requisite intent under § 9(a)(1) of the Exchange Act.

The scienter standard for a § 9(a) claim has not been clearly defined by the Third Circuit. The Third Circuit has stated that "Scienter is 'a mental state embracing intent to deceive, manipulate or defraud,'. . . [and] the scienter required for securities fraud includes recklessness." *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000) (quoting *Hochfelder*, 425 U.S. at 193 n.12). *Infinity Group*, however, does not address liability under § 9(a). On the other hand, the D.C. Circuit has found that § 9(a) "requires a showing of specific intent." *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005) (citation omitted). This Court need not decide this issue today because the SEC has satisfied the scienter element under both the recklessness and the specific intent standards.

A court may infer from the circumstances surrounding a defendant's trading scheme to find that a defendant acted with scienter or for the purpose of creating a false or misleading appearance of active trading. *See SEC v. Sripetch*, No. 20-01864, 2020 WL 6396927, at *6 (S.D. Cal. Nov. 2, 2020) (finding the scienter and purpose requirements were satisfied by "the timing and frequency of these manipulative trades"); *Competitive Techs., Inc.*, 2005 WL 1719725, at *3 n.3 (finding that

the scienter and purpose elements are "normally inferred from the circumstances of the case" (alteration and citation omitted)).

There is sufficient record evidence showing that Gu executed matched orders and wash trades with scienter and for the purpose of creating a false or misleading appearance of active trading in certain securities.  First, Gu acknowledges that the purpose of his wash trades was to "make money on the rebates," (D.E. 70-3 Tr. 124:21–25), and the trades were not profitable absent the rebates.  (*Id.* at 37:8–11.)  He also understood that he would make a profit when he traded options between two accounts he controlled where one account paid liquidity rebates and the other account did not charge a take fee.  (*See* D.E. 83-1 ¶¶ 77–81, 129.)

Second, to accomplish his objective, he also intentionally traded options that he thought were unattractive to other market participants to ensure that he would be on both sides of his trades.  (*See id.* ¶¶ 81, 82, 84, 85, 89, 139.)  Furthermore, to ensure that his wash trade strategy would succeed, he placed small "test trades" in the beginning to ensure that his scheme would work.  (*Id.* ¶ 132.)

Third, Gu used multiple trading accounts at different brokerage firms to execute trades at virtually the same time to conceal the fact that he was the counterparty to his own trades.  (*See id.* ¶¶ 130–31 (Interactive and Robinhood), 194 (Lightspeed and Yixian Gu's account), 218 (Lightspeed and Firstrade), 265 (Lightspeed and Channer's account), 282 (Lightspeed and Webull), 310–12 (Lightspeed and Wechselberger's account).)  He did so because he knew that placing identical buy and sell orders in the same account would not generate liquidity rebates.  (*Id.* ¶ 80.)

In addition, when Robinhood and Interactive suspended Gu's and Lee's accounts in March 2021 because of concerns about their trading patterns, Lee stopped trading and sent Gu a link to

13

Wikipedia's definition of "wash trading," which accurately described Gu's conduct.  (*Id.* ¶¶ 94, 146.)  There is no dispute that Gu willfully ignored obvious red flags about the propriety of his conduct as he continued to carry out his trading scheme by opening and using accounts at other brokerage firms, such as Lightspeed, Webull, and Firstrade.

Lastly, Gu repeatedly concealed from multiple brokerage firms the fact that most of his trades did not result in any change in beneficial ownership of the traded securities.[13]  (*Id.* ¶¶ 137–38.)  For example:

- When Interactive asked Gu who were the counterparties in his trades, he declined to answer because he thought if he told the truth, Interactive would be less likely to reinstate his account.  (*Id.* ¶¶ 161–62.)

- When Lightspeed asked Gu about his trading strategy, Gu concealed from Lightspeed that he intended to be the counterparty to his trades.  (*Id.* ¶¶ 210–17.) Gu did not tell Lightspeed the truth because he did not want Lightspeed to close his account and he wanted to continue to profit from his trading strategy.[14]  (*Id.* ¶ 210.)

- Gu admits that he was afraid that Lightspeed would prevent him from opening an account if he told Lightspeed that he switched from Interactive to Lightspeed because Interactive suspended his account.  (*Id.* ¶¶ 174–77.)

To further conceal his scheme, Gu also used virtual private servers to create the appearance that his trades came from different IP addresses to mask the fact that he was executing trades from different accounts at virtually the same time.  (*See id.* ¶¶ 192, 263, 307, 308.)

The uncontested facts in the record demonstrate that Gu traded with the purpose of creating the appearance of active trading in certain securities, a necessary condition to the success of his scheme, in order to obtain liquidity rebates, which he admits was his intent.  The circumstances surrounding Gu's trading scheme clearly show Gu acted with scienter.

---

[13] Interactive, Robinhood, Lightspeed, and Firstrade all prohibit wash trading.  (*Id.* ¶¶ 90–93.)

[14] Gu also lied to Firstrade about his trading strategy and reasons for opening new brokerage accounts.  (*Id.* ¶¶ 235–50.)

**B.  Section 10(b) of the Exchange Act, Rule 10b-5, and § 17(a) of the Securities Act (Counts I & II)**

The SEC also argues that Gu's wash trading scheme violated § 17(a)[15] of the Securities Act and § 10(b)[16] of the Exchange Act and Rule 10b-5 thereunder.

Section 17(a) of the Securities Act prohibits fraudulent conduct in the *offer or sale* of securities, while § 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraudulent conduct in connection with the *purchase or sale* of securities.  *See* 15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5.  The elements required to prove violations of these statutes and rule are "essentially the same." *SEC v. Desai*, 145 F. Supp. 3d 329, 335 (D.N.J. 2015) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (finding elements of Securities Act § 17(a) mirror those of Exchange Act §10(b)), *aff'd*, 672 F. App'x. 201 (3d Cir. 2016).

---

[15] Section 17(a) provides that it is unlawful for any person in the offer or sale of any securities:

> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

[16] Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations."  15 U.S.C. § 78j(b); *see Lewis v. Chrysler Corp.*, 949 F.2d 644, 648 (3d Cir. 1991).  Rule 10b–5, promulgated under § 10(b), makes it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

The SEC brings Count I under §§ 17(a)(1) and (2) and Count II under § 10(b) and Rule 10b-5. Accordingly, to prove a violation of §§ 17(a)(1) and (2), § 10(b), and Rule 10b-5, the SEC must show that:

> (1) the defendant made a misrepresentation, or an omission where there was a duty to speak, or used a fraudulent device; (2) the misrepresentation or omission was material; (3) the defendant made the misrepresentation or omission with scienter; (4) the defendant made the misrepresentation or omission in connection with the [offer, purchase, and/or sale] of a security; and (5) the defendant made the misrepresentation or omission in connection with interstate commerce or the mails.

*Desai*, 145 F. Supp. 3d at 335.[17]

Based on the undisputed material facts in the record, this Court finds that no reasonable jury could find in favor of Gu on any of the elements.

> i.    *Fraudulent device and misrepresentations or omissions in the offer, purchase, or sale of securities*

Gu's trading scheme, comprised of thousands of matched orders and wash trades, was a fraudulent device. It is well established that wash trades are an "inherently fraudulent practice" that is prohibited by §10(b) and Rule 10b-5. *SEC v. Gu*, No. 21-17578, 2022 WL 2753478, at *2 (D.N.J. July 13, 2022) (citing *Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 124 (2d Cir. 1999) ("Artificial trades, such as wash transactions . . . have no purpose save to avoid some legal, statutory, regulatory, or contractual obligation or to manipulate the market.")); *see also Santa Fe Indus.*, 430 U.S. at 476 ("Manipulation . . . refers generally to practices, such as wash

---

[17] To prove a violation of §§ 17(a)(2) and (3) of the Securities Act, a plaintiff need not establish scienter. *First Jersey Sec.*, *supra*, 101 F.3d at 1467 (citing *Aaron v. SEC*, 446 U.S. 680, 701–02 (1980)). Rather, "[a] violation . . . can be established by a showing of negligence." *SEC v. Hughes Cap. Corp.*, 124 F.3d 449, 453 (3d Cir. 1997) (citing *Aaron*, 446 U.S. at 701–02). Therefore, if the SEC satisfies the elements required for a violation of § 17(a)(1) claim, it will also prevail on a violation of § 17(a)(2) claim.

sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.")

As previously discussed, there is no genuine dispute of material fact that Gu engaged in thousands of wash trades that did not result in change in beneficial ownership. *See* Part III.A.ii, *supra*. Beyond the fraudulent wash trades, Gu went to great lengths to conceal his trading scheme and to deceive other market participants. This Court has described Gu's other deceptive conduct in detail above, and therefore provides only some examples here:

- Gu traded with himself using multiple accounts he owned at different brokerage firms, (*see* D.E. 83-1 ¶¶ 130–31, 194, 218, 265, 282, 290, 310–12);

- Gu used virtual private servers to conceal the extent of his wash trading, (*see id*. ¶¶ 192, 263, 307);

- Gu lied or made misleading or false representations to brokerage firms to open and maintain accounts that permit options trading, (*see id.* ¶¶ 103, 107, 114, 174–76, 211–12; 216, 235–48; 259, 302, 304);

- After Interactive and Robinhood suspended his accounts, Gu continued his scheme by opening new accounts at different brokerage firms, *(see, e.g., id*. ¶ 163); and

- Gu also began trading in accounts nominally owned by other individuals. (*See id*. ¶¶ 188–202, 264–73, 276, 278, 301–10.)

Therefore, the record evidence sufficiently shows that Gu executed trades and engaged in deceptive conduct for the purpose of creating a false or misleading appearance of active trading in certain securities.

ii.    *Duty to speak*

Under § 10(b) and Rule 10b-5, "[d]isclosure is required . . . when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Even when there is no existing independent duty to speak, "[o]nce a [market participant] has

chosen to speak on an issue . . . it cannot omit material facts related to that issue as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490–91 (3d Cir. 1994) (explaining that "encompassed within that general obligation [to speak truthfully] is also an obligation or 'duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated")).

Gu argues that he had no duty to truthfully disclose his trading strategy to brokers but cites no legal authority to support this argument. Gu, like every participant in the securities markets, had a duty to tell the truth when he chose to communicate information to brokers and when his failure to do so would render his statements misleading. Gu breached that duty when he repeatedly made false or misleading representations to brokerage firms regarding his trading experience and strategy to open and maintain accounts and to conceal his wash trading scheme.[18]

### iii.    Materiality

There is no genuine dispute that Gu's misrepresentations and omissions were material.

A statement or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, (1976). Wash trades "necessarily convey information about demand and price, which are quintessentially *material* to investors." *United States v. Coscia*, 177 F. Supp. 3d 1087, 1092 (N.D. Ill. 2016), *aff'd*, 866 F.3d 782 (7th Cir. 2017) (emphasis added).

---

[18] The duty-to-disclose element in a § 10(b) and Rule 10b-5 claim is also satisfied when a plaintiff can prove the materiality of the omitted facts, as courts have found that "where the duty to disclose arises from a need to avoid false or misleading statements 'the inquiries as to duty and materiality coalesce.'" *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 564 (S.D.N.Y. 2011) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). As discussed in Part III.B.iii, *infra*, the SEC has proven that Gu's misrepresentations and omissions were material.

Gu's wash trades often represented the majority of the total trading volume in the securities he traded, creating a highly inflated, but false image of liquidity and trading activity for certain securities. (*See* D.E. 83-1 ¶¶ 328–31.) Gu's trades were visible to other investors and a small percentage of Gu's non-marketable orders was traded with other investors. (*Id.* ¶¶ 140, 274, 312.) Therefore, Gu's wash trades injected materially false and misleading information into the market and caused some investors to decide to trade with Gu.

The false and misleading information Gu provided to different brokerage firms to perpetuate his wash trades was material to those firms as well. Interactive, Robinhood, Lightspeed, and Firstrade all prohibit wash trades. (*Id.* ¶¶ 90–93.) But for Gu's misrepresentations and omissions which concealed the true nature and purpose of his scheme, the brokerage firms would not have allowed him to engage in wash trading. In fact, when they became aware or suspicious of Gu's trades, they questioned Gu and ultimately suspended trading in his accounts. (*See id.* ¶¶ 146, 234, 324.)

*iv.*     *Scienter*

Unlike § 9(a), § 10(b) and Rule 10b-5 only require recklessness to establish scienter. *See In re Ikon Off. Sols.*, Inc., 277 F.3d 658, 667 (3d Cir. 2002) (citing *Infinity Grp. Co.*, 212 F.3d at 192). Recklessness is defined as "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Infinity Grp. Co.*, 212 F.3d at 192 (citation omitted).

To establish scienter, the SEC must either "(1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,

1422 (3d Cir. 1997) (citation omitted). A defendant's "intent can be inferred from [his] conduct." *SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007). "[I]n a non-disclosure situation, any required element of scienter is satisfied where, as here, the defendant had actual knowledge of the material information." *Fenstermacher v. Phila. Nat. Bank*, 493 F.2d 333, 340 (3d Cir. 1974).

Placing matched orders or wash trades in violation of § 9(a)(1) also violates § 10(b). As discussed in detail above, there is ample evidence that Gu acted with specific intent to execute wash trades and to create a false or misleading appearance of active trading for the securities he traded to conceal his scheme. For example, Gu acted at least recklessly by placing wash trades and communicating false information to brokerage firms. *See Amanat v. SEC*, 269 F. App'x. 217, 220 (3d Cir. 2008) (affirming the SEC's finding that defendant who wash-traded to obtain rebates acted willfully in violation of § 10(b) and Rule 10b-5). In addition, the fact that Gu continued to carry out his scheme after Robinhood and Interactive froze his accounts, after multiple brokerage firms questioned the nature of his trades, and after Lee sent him a definition of wash trading and stopped trading himself supports a finding of scienter.

     *v.     In connection with interstate commerce or the mails*

Gu purchased and sold thousands of options during the course of his scheme, and he acted through instrumentalities of interstate commerce, including the telephone system, the Internet, and securities exchanges, (D.E. 83-1 ¶¶ 53, 57, 62, 66, 164), thereby satisfying the requirement that Gu's misrepresentations or omissions were made in connection with interstate commerce or the mails.

In sum, the SEC has sufficiently proven that Gu violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder and § 17(a)(1) and (2). Accordingly, this Court will grant the SEC's Motion for Summary Judgment.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the SEC's Motion is **GRANTED**.  An appropriate order follows.

_____/s/ Susan D. Wigenton_____
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:        Clerk
cc:          André M. Espinosa, U.S.M.J.
             Parties